Hearing #25.041X

## STATE OF MAINE
## SPECIAL EDUCATION DUE PROCESS HEARING

| | | |
|---|---|---|
| **SANFORD PUBLIC SCHOOLS** | ) ) ) | |
| | ) | **ORDER** |
| **v.** | ) ) | |
| **PARENTS** | ) | |

A due process hearing was held via zoom on December 2, 2024. Present and participating throughout the hearing were: Hearing Officer David C. Webb, Esq.; the Parent (mother); Isabel Ekman, Esq. and Jordan Quenneville, Esq., counsel to Sanford Public Schools (District); and Stacy Bissell, Special Education Director for the District.

**PROCEDURAL BACKGROUND**

On November 12, 2024, the District filed an expedited due process hearing request against the Parents ("Parents") alleging that due to the Student's aggressive behaviors he should be placed in the Bridge Program, a therapeutic day treatment program within the District.[1] On November 21, 2024, a prehearing conference was held with the Hearing Officer, counsel and parties. Documents and witness lists were exchanged in a timely manner. The Parent distributed 30 pages of documents (herein referenced as P-#) and the District distributed 594 pages of documents (herein referenced as S-#).[2]

The parties requested to keep the hearing record open to allow the parties to prepare and submit closing arguments. Pursuant to a post hearing order issued on December 2, 2024, the closing arguments were due on December 4, 2024 and limited to a maximum of 15 pages.

---

[1] The Bridge Program is a self contained off campus program offered through the District with specialized and trained staff with a goal to help students with problematic behaviors.[Bissell testimony].
[2] On October 28, 2024 the Parents filed a non-expedited hearing against the District (25.040X) alleging, *inter alia,* that the District denied the Student a Free, Appropriate Public Education (FAPE) and requesting that the Student remain in his current educational setting at MCS pending the outcome of the due process hearing. This case is scheduled to be heard in early January, 2025.

1

The record closed upon receipt of the briefs on December 4, 2024.  The Hearing Officer's decision is due on December 16, 2024.

**ISSUES:**  Evidence was taken on the following issues:

a. Would returning the Student to the Margaret Chase Smith Elementary School be substantially likely to result in injury to the Student or others?
b. If the answer to the preceding questions is in the affirmative, is the interim educational setting offered by the District appropriate under the requirements of the IDEA?

<u>Testifying at the hearing were:</u>

- Tracie Hallissey; Margaret Chase Smith School Principal;
- Stacey Bissell; Special Education Director; and
- Rebekah Bickford, PsyD. Psychologist, GrowWell Child Psychology.

All testimony was taken under oath.

1. **FINDINGS OF FACT**

    1. The Student is 10 years old (d.o.b. 09/24/2014) and resides with his Parents within the Sanford school district ("the District"), where he is enrolled as a fourth grader at the Margaret Chase Smith elementary school ("MCS").  [Hallisey testimony].

    2. During his kindergarten year (2019-2020), the Student was identified for special education services as a student with a speech/language impairment. [S-407]. The Student demonstrated aggressive behaviors during his kindergarten year and was placed on an abbreviated school day which continued through his first and second grade years. [Hallisey testimony].  The Student was identified for special education under Other Health Impairment (OHI) in January, 2021 to address ongoing behavior issues during his first grade year. [S-74].

3. The Student was involved in multiple behavior incidents during the Student's kindergarten through his second grade years. [S-48, S-153, S-144, S-150, Hallisey testimony].

4. During his second grade year in March of 2023, a determination was made to refer the Student to Sanford Pride elementary because of his continuing aggressive behaviors and need for restraints. The Student finished his second grade year at the Pride school and was then provided with tutoring until he was placed at Sweetser Day Treatment, a special purpose private school in Saco, Maine, during his third grade year. [S-450].

5. Rebekah Bickford, PsyD., is a psychologist who worked with the Student during his second grade year. [Bickford testimony]. She has not had contact with the Student since he left Pride elementary at the end of his second grade year in May of 2023. [Bickford testimony].

6. As a result of an evaluation conducted in May of 2023, Dr. Bickford diagnosed the Student with an intermittent explosive disorder. [Bickford testimony, S-408]. The Student's propensity to be aggressive towards peers and his unpredictability are the most difficult challenges when developing a plan for him. [Bickford testimony]. She testified that if the Student wasn't receiving the services and supports within his IEP that his behaviors "could escalate." [Bickford testimony]. Dr. Bickford noted in her testimony that while the Student has below average phonological skills, he has "no real cognitive deficits" and an IQ of 108. [Bickford testimony].

7. Dr. Bickford believed that the Student would likely to hurt himself if he returned to MCS and that the Bridge Program, which she is familiar with, would be an appropriate placement for him. [Bickford testimony].

8. Ms. Bissell, the District's Special Education Director, took over responsibility for the Student's case when he was placed at Sweetser during his third grade (2023-2024) year. [Bissell testimony].

9. An IEP was developed for the Student on November 14, 2023 which provided that he would receive 25 hours per week of SDI in the special education setting, 60 minutes of group and individual occupational therapy and 90 minutes per week of group and individual social work services. [S-479]. The Team also determined that the Student would have ed tech and BHP behavior supports, a behavior intervention plan and social work crisis support. [S-478].

10. While at Sweetser, the Student's public displays of aggression were less frequent with only two instances where he needed to be restrained. [Bissell testimony].

11. Ms. Bissell credited his improved behavior at Sweetser due to fewer academic demands, less time in the academic setting and a higher student/staff ratio. [Bissell testimony]. While at Sweetser, the Student still had not developed any stamina for academic work and continued to exhibit some aggressive and disruptive behaviors especially when transitioning to non-preferred activities. [Bissell testimony, S-515, 525].

12. At the conclusion of the 2023-24 school year, Ms. Bissell talked to the Parents about changing the Student's placement back to MCS due to the Student's success at Sweetser. [Bissell testimony]. Ms. Bissell knew that the Parents wanted the Student to return to this placement.[3] [Bissell testimony]. Ms. Bissell noted that typically students placed at Sweetser transition to the Bridge Program before returning to MCS. [Bissell testimony]. The Student earned the ability to return to MCS by refraining from physical

---

[3] There was no written notice or other documentation introduced at the hearing regarding the determination to return the Student back to MCS from his placement at Sweetser.

4

aggression and therefore "should be acknowledged for that aspect of growth while at Sweetser." [Bissell testimony; S-525].

13. After the Student was reenrolled at MCS in the fall of 2024, he again exhibited a series of aggressive behaviors towards staff and peers.[4] [Hallissey testimony.] Although two of the incidents required restraints, none of the injuries reported were serious. [Hallissey testimony]. The behavior incident reports for these incidences indicate "no injury" and "no medical services provided."[5] [S-532-535].

14. No IEP team meeting was convened to address the Student's transition from Sweetser to MCS. Ms. Bissell testified that she had a meeting with staff about the Student on the "teacher workshop day" prior to the start of the 2024-25 school year. At Sweetser, the Student had fewer aggressive behaviors except for in situations where the Student was transitioning to "non-preferred" activities. [Bissell testimony]. Prior to the Student's reenrollment at MCS, Ms. Bissell was "not sure" if there were any discussions about adjustments to the Student's IEP or what was in place to reduce the likelihood of negative behaviors. [Bissell testimony].

---

[4]

| date | alignment | details | injury | consequence |
|------|-----------|---------|--------|-------------|
| 9/10/24 | discipline | put his hands around another student's neck who he thought was going to pinch him | No | In school suspension .2 days |
| 9/27/24 | discipline | refused to leave school grounds during a fire drill [S-535]; | No | Office referral/conference with Student |
| 9/30/24 | discipline | threatened to punch and threw a chair at a teacher; tried to elope[S-534] | No | In school suspension .2 days |
| 10/2/24 | discipline | he threatened and threw classroom objects at staff [S-533] | No | Restraint; .2 days |
| 10/3/24 | discipline | tried to cut another student with scissors [S-532]. | No | Teacher warning |
| 10/4/24 | discipline | grabbed teacher; threw cushions at other students [S-532] | No | Out of school suspension until emergency IEP team meeting (meeting held 10/18) |

[5] The incident reports specifically state that no injuries or medical attention was provided, however Ms. Hallissey testified that District only documents injury "if the victim is taken by ambulance or if needing to fill out state forms. [Hallissey testimony].

5

15. Because the District determined that the Student's suspension and change of placement to the Bridge Program were not disciplinary, it did not conduct a manifestation determination review (MDR) in order to determine if the Student's behavior was a manifestation of his disability.[6] [S-007]. There was no referral for a threat assessment or an updated functional behavior assessment following these behavior incidents. [Bissell testimony].

16. Ms. Bissell testified that she helped to create the Bridge Program, which offers a smaller setting, higher teacher-to-student ratio, with more clinical support. The staff includes trained teachers, a neuropsychologist 24 hours per week, two counselors and an LCSW. [Bissell Testimony].

17. In an undated letter, Principal Hallissey notified the Parents that the Student had been suspended. Her letter to the Parents reads, in relevant part: "As I discussed in person during our meeting on October 4th …[the Student] will be suspended from school for the incident until we can hold an emergency IEP meeting with the team.[S-585].

18. On October 18, 2024 the IEP team convened. [S-522] The Written Notice for the meeting designated the meeting as the Student's annual review [and] Chapter 33 meeting "as there have been 3 incidents of restraints/seclusions." [Bissell testimony, S-523].[7]

19. The Written Notice for the October 18, 2024 IEP team meeting noted that team had determined that the least restrictive environment (LRE) for the Student was the Bridge Program in Sanford. At this meeting, Ms. Bissell stated that the Student's behavior "is

---

[6] During the expedited hearing on December 2, 2024, counsel for the District stipulated that the Student's behavior at all relevant times herein was a manifestation of his disability.

[7] The October 18 WN was amended to reflect that after review, the Student "actually had 2 instances [of restraint] and the third seclusion instance was him secluding himself so it wasn't involuntary, therefore he did not need an incident report under Chapter 33."

6

escalating and is a similar pattern that happened at Sweetser. When he perceives work to be too hard, he will increase his behaviors to escape the difficulty of work…"[S-528].

20. There were no discussions at the October 18, 2024 IEP team meeting about why the Student's behaviors were better at Sweetser and why they were regressing at MCS. [S-523]. It was noted that the Student's "behavioral targets and his progress…were the same ones that he had at Sweetser last year: use coping skills, stay in assigned areas, be safe, ignore others, focus on himself, use appropriate words and voice." [S-523].

21. Ms. Bissell suggested that a "restorative meeting" be held between the Parents and the school staff to let the Student know that the "Parents do support the School." [Bissell testimony]. There are no other statements in the written notice with regard to supporting the Student's work avoidance issues.[8]

22. On October 20, 2024, Ms. Bissell wrote an email to the Parent stating: "I am reaching out to let you know [the Student] can return to MCS tomorrow." [S-594]. Ms. Bissell added that upon the Student's "return to MCS tomorrow, we will remove the blue tape that was used to designate "his bubble" [and] we will also stop using DM (for does not meet) and will be using 0's as the rest of his peers in the classroom." [S-594].

23. Principal Hallissey noted that while suspensions are a form of discipline and the Student's behaviors on/around October 4 were violations of the student code of conduct, the suspension that was given to the Student was not considered a form of discipline. [Hallissey testimony].

24. After the IEP team's determination to move the Student to the Bridge Program, the Parents filed a due process hearing seeking stay put at MCS pursuant to 34 C.F.R. §

---

[8] Ms. Bissell testified that the District continued to implement the IEP from Sweetser despite the Student's elevated behaviors and that "his academic skills were not progressing."[Bissell testimony]. When asked about whether it made sense to update the Student's FBA, Ms. Bissell testified: "[We had] already done an FBA [in June of 2023 and there was] no reason to believe functions had changed."

7

300.533. (Maine Department of Education case number #25.040H, filed October 28, 2024.)

**25.** On October 28, 2024 the District filed the within expedited due process hearing request seeking removal of the Student for 45 days under MUSER §XVII.3 and §300.532(c)(1).

**2.    SUMMARY OF THE PARTIES' ARGUMENTS**

**Brief summary of the position of the District:**

The Individuals with Disabilities Education Act (IDEA) specifically authorizes a hearing officer to order a change of placement to a 45-day interim alternative educational setting if the hearing officer determines that maintaining the current placement of the child is "substantially likely to result in injury to the child or to others." This Student's lengthy history of frequent and significantly unsafe behaviors makes it clear that he cannot safely continue his placement at MCS. Case law interpreting the definition of "injury" for the scope of this provision clarifies that serious physical harm need not be caused before students can be deemed "substantially likely to cause injury." Additionally, a statutory change in 2006 removed the requirement of a finding of "reasonable efforts to minimize," injury by a district before a Student can be removed. The IEP team's decision to change the Student's program was not disciplinary in nature therefore it was not required to conduct a manifestation determination. In any event, this issue is not a proper issue before the Hearing Officer as the Parents have not raised this claim.

The Bridge Program is an Appropriate Interim Alternative Educational Setting for the Student. Bridge is a full-day, therapeutic special purpose public school. The program has smaller class sizes, a higher staff-to-student ratio, and staff that are well-trained to address behavioral, emotional and functional needs.

**Brief summary of the position of the Parents:**

The District's decision to change the Student's placement is contrary to the requirements

8

of MUSER §XVII.  Specifically, the District violated the IDEA by failing to conduct a manifestation determination, which would have helped to identify and address the causes of his behavior.  In addition, the District's decision to change the Student's placement did not follow the law with regard to MUSER §XVII.1.g. which allows a school district to remove a student to an interim alternative educational setting (IAES) without regard to whether the behavior is a manifestation of the student's disability only if a student possesses a weapon at school, knowingly uses or sells illegal drugs or has inflicted serious bodily injury upon another person. None of the behaviors identified in MUSER §XVII.1.g were proven by the District to warrant a change in placement without first conducting a manifestation determination review.

The evidence that was presented regarding the Student's behaviors prior to his third grade year are not relevant as those behaviors were addressed in a different Department of Education case after which the Student was sent to Sweetser for a year where his behavior improved significantly.  As a result, the Student's placement should be returned to MCS until the pending case filed by the Parents (25.040H) is resolved.

3. **LEGAL STANDARD AND ANALYSIS**

Although the IDEA is silent on the allocation of the burden of proof, the Supreme Court has held that in an administrative hearing challenging an IEP, the burden of persuasion, lies with the party seeking relief. *Schaffer v. Weast*, 126 S.Ct. 528, 537 (2005).  Accordingly, the District bears the burden of proof as the party seeking relief in this hearing.

As reflected in the state and federal regulations noted above, the Supreme Court has authorized a very narrow judicial exception to the stay put requirement where school officials can establish that the current placement is "substantially likely to result in injury either to (the

9

handicapped child) or to others." [9] *Honig v. Doe,* 484 U.S. 305, 328, 108 S. Ct. 592, 606, 98 L.Ed.2d 686 (1988). The provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placements is ultimately resolved." *Drinker by Drinker v. Colonial School Dist.*, 78 F.3d 859, 864. (3d Cir. 1996).  As the *Honig* court noted, "Congress very much meant to strip schools of the unilateral authority that they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school." *Honig* 484 U.S. at 323 (1988).

In determining the issues noted above, MUSER §XVII.3.B provides, in relevant part, that a Hearing Officer shall "make a determination regarding an appeal under paragraph (A) of this section" and may:

> (a) Return the child with a disability to the placement from which the child was removed if the hearing officer determines that the removal was a violation of 34 CFR §300.530 or that the child's behavior was a manifestation of the child's disability; or

> (b) Order a change of placement of the child with a disability to an appropriate interim alternative educational setting for not more than 45 school days if the hearing officer determines that maintaining the current placement of the child is substantially likely to result in injury to the child or to others.

As noted above, MUSER §XVII and 34 CFR §300.530 address issues surrounding student discipline issues.[10]  In the present case, the District argues that the determination to place the Student at the Bridge Program in Sanford was not due to discipline issues but rather because is the least restrictive environment (LRE) for the Student to receive a FAPE.  Parents argue that these removals were disciplinary, noting that the Student was suspended for his

---

[9] *See,* MUSER §XVI.20.A.

[10] The IDEA and MUSER provide a limited exception to allowing a school district to remove a student to an interim alternative educational setting (IAES) without regard to whether the behavior is a manifestation of the student's disability if a student possesses a weapon at school, knowingly uses or sells illegal drugs or has inflicted serious bodily injury upon another person.  See, 20 U.S.C. 1415(k)(1)(G)(iii); 34 C.F.R. 300.530(g)(3), MUSER §XVII.3.B. None of these circumstances have been alleged in the present case.

10

behaviors.

While the Student's behaviors outlined herein were violations of the MSC student code of conduct, the evidence supports a finding that the District did not consider the October 18, 2024 IEP amendment to be a disciplinary removal. [Hallissey testimony].

In *St. Johns County School Board* Florida State Educational Agency 23-1044EDM, 123 LRP 16099 April 25, 2023, a case very similar to the case at hand, the parents of a behaviorally challenged special education student filed a due process complaint and motion for stay put contesting the IEP team's decision to change his placement to a self-contained unit in a different school. *Id.* The school board argued that this change of placement was not disciplinary but was focused on the student's performance and behaviors and that maintaining the child in his current placement placed the child and other students in danger. *Id*. Several days after the parents filed their complaint, the school filed a request for an expedited due process hearing asserting that the student's current educational setting placed the child and other students in danger. *Id.* In support of the request, the school board cited Florida state special education rule 6A-6.03312(7)(a) which allows a school to file for an expedited hearing if it believes that maintaining the current placement of the student is substantially likely to result in injury to the student or to others. *Id.*

The *St. Johns County* Administrative Law Judge (ALJ) Lawrence Stevenson dismissed the school board's request to maintain the new placement as an inappropriate use of the expedited hearing process. *Id*. In his ruling, the ALJ Stevenson held:

> …[T]he School Board may request an expedited hearing "if it believes that returning the student to the original placement is substantially likely to result in injury to the student or others." This provision must be considered not in a vacuum but in light of the overall language of the rule. Rule 6A-6.03312(7)(b) does not give a school district carte blanche to invoke the expedited hearing process any time it considers a student to be a threat. The context is that of a rule setting forth "discipline procedures" and of a student whose placement has been changed "because of disciplinary removals."
>
> In this case, the student's placement was not changed because of disciplinary removals. The School Board has invoked rule 6A-6.03312(7)(b) not to maintain the status

11

quo following a disciplinary change of placement but to keep the student in an academic placement with which the parents disagree. This was an inappropriate use of the rule. *St. Johns County School Board* 123 LRP 16099

In the present case, MUSER §XVI.21.C. (4), limits the expedited hearing process for *persons who have been removed from school for disciplinary purposes*.[11] (emphasis in original noting state promulgated language). MUSER §XVII 3.A specifies that if an SAU believes that maintaining the current placement is substantially likely to result in injury to the child or others, it may appeal the *decision* regarding placement under §§ 300.530 and 300.531 and request an expedited hearing. MUSER §XVII 3.A. (emphasis added). Both of the CFR sections referenced in MUSER §XVII 3.A address placement decisions regarding *discipline* issues: §300.530 addresses the authority of school personnel to determine a change of placement for a child with a disability *who violates a code of student conduct* (emphasis added) and 34 CFR §300.531 addresses the IEP Team's determination of the interim alternative educational setting for services referenced under § 300.530(c), (d)(5), and (g), each of which are related to discipline related matters.[12]

Because this case does not involve a disciplinary removal, the District improperly invoked the expedited hearing process. MUSER §XVII.3.A and B. Accordingly, **it is hereby ORDERED** that Case # 25.041X is **DISMISSED**.

The Student's stay-put placement, pending the outcome of Case # 25.040H, will be restored to his "then-current placement" at the Margaret Chase Smith school, with all required services and supports in place at the time prior to the adoption of the October 18, 2024 IEP

---

[11] MUSER also provide a limited exception to allowing a school district to remove a student to an interim alternative educational setting (IAES) without regard to whether the behavior is a manifestation of the student's disability if a student possesses a weapon at school, knowingly uses or sells illegal drugs or has inflicted serious bodily injury upon another person. See, 20 U.S.C. 1415(k)(1)(G)(iii); 34 C.F.R. 300.530(g)(3), MUSER §XVII.3.B. None of these circumstances have been alleged in the present case.

[12] § 300.530(c), addresses disciplinary changes in placement for behavior that is determined not to be a manifestation of the child's disability. § 300.530 (d)(5), addresses changes of placement because of disciplinary removals and § 300.530 (g) addresses situations where a student possesses a weapon at school, knowingly uses or sells illegal drugs or has inflicted serious bodily injury upon another person, which, as noted above, is not alleged in this case.

amendment.

Dated December 15, 2024

_____
David C. Webb, Esq., Hearing Officer